Per Curiam.
We will consider of the charges in the complainant’s bill, so far as they seem to be established by confessions in the answer or proofs in the cause. And first, as to the 5,000 acres, an entry was made of them in the name of William Maclin, by Elijah Robertson, on the 23d of February, 1784. Robertson paid the purchase money. The answer admits that he, Robertson, procured the entry to be made, which could not be without the purchase money. On the 17th of December, 1794, a grant issued ; on the 17th of February, 1797, or shortly afterwards, Elijah Robertson died; on the 25th of September, 1797, the executors of Elijah Robertson gave to William Maclin a general power to settle all Ms unsettled business. William Maclin was a minor when the entry was made. In 1786-he was a youth not fully grown. He lived with Elijah Robertson five or six years, from 1788. He was not absent long enough in that time to have done much surveying business for Elijah Robertson. The greater part of it was done by Mulherrin, Weakly, and Hickman. He was twice absent on business for Elijah Robertson in Virginia, North Carolina, and Kentucky. He confessed he had received a tract of land of 1,000 acres for his .services from Elijah Robertson. He was boarded by Elijah Robertson, who furnished him with several suits of clothes. One of the witnesses thinks his services not worth much more than his support by Robertson, under whose protection he was, and by whom he was supported. The answer says, this ought not to be viewed as a trust, for he believes it was intended as a compensation for services. Before we apply the law to these facts, let us determine whether * a satisfaction for services, proved by a confession, which states a satisfaction by deed of conveyance of lands to the creditor, which he sold, must be fortified by production of the deed. If you claim under a deed, you must produce and prove it. The court must see whether the words of it do legally support the claim made upon it. But if you claim by a fact, and no deed be made or required by law for the establishment of that fact, then you may *58 prove the fact by parol. You may prove the confession of it by your adversary. And if the confession not only state the fact, but the means also by which it was caused to exist, the fact remains proved, though the means be not proved at all; also, the means, though consisting of deeds, may be proved by parol: Peake’s Evidence, 12, in a note ; because the title supposed to be conveyed by the deeds is not now to be examined. If by parol such means may be proved, then of consequence by confession, which is a substitute for the proof of the fact itself. The whole of that confession is adopted as legal evidence. It may be that the fact confessed may not have much, if any, influence in this case. The grant which issued to Maelin in 1794, like other grants, it is supposed, states a consideration of ten pounds for every hundred acres paid into the treasury by the grantee. Can it be proved by parol that the consideration was not paid by him, but by Elijah Robertson ? Without detailing reasons, it is sufficient to say that the affirmative is too well supported by former decisions to be now called into question. 10 Ves. junior, 511; 2 Atk. 71; 1 Atk. 59; Amb. 413.. That the testimony ought to be clear which establishes the payment of the purchase money by him who claims to be cestui que trust, is admitted and felt. That fact, however, is clearly proved. It is not pretended in the answer that William Maelin paid it, or sent it to the office by Robertson, or any other person. And we know that by law as well as practice, the entry could «not have * been made without payment of the purchase money. And .that, by all the authorities, raises a resulting trust for him, unless the conveyances were made to a wife or child, or unless he manifested his intention that the trust should be for the grantee. This may be inferred from unequivocal circumstances, as ■well as from express declarations ; but the existence of circumstances evincive of such intention is strongly insisted on. These are said to be the services performed by Maelin for which he received no compensation, and the long quiescence of Robertson without requiring a transfer of the entry or conveyance by deed of the land after it was granted. It is not perceived that at the time of the' entry he had performed services. He speaks of locations written for Mark Robertson and Elijah Robertson, and of a promise to procure a tract of land for him in case.of a successful disposal of them. There is no proof of this service, nor of the successful disposal, upon which *59 were founded his expectations of retribution. As to his services since performed, there is no proof of any agreement concerning them in relation to this land. His services were not equal to the value of this land, which seems essential to the presumption that Robertson deemed it incumbent upon him to relinquish the resulting trust, which he had at and immediately after making of the entry. There is nothing then remaining to obviate this claim of the complainants, but the protraction of time before its advancement. This, in all instances, is a diminution of its lustre, increasing in proportion to the length of the delay. Maelin probably came of age in 1788 or 1789. He lived five or six years, says Judge McNary, with Robertson after 1788; that brings his departure to 1794. He lived with him, says Maelin himself, till 27 years of age. Take six from 1794 and 1788 remains. In 1788 he was not full grown, says Hickman.. From 1788 to the death of Elijah Robertson in February, 1797, is a space of nine years, * in which Maelin was not called on to transfer the entry. In 1797 the executors gave him a general power to settle all the unsettled business of Robertson. They did not require a delivery of this grant. They did not speak of compensation for these services. He is not called upon for the legal estate till 1808, when this bill was filed. Neither Robertson in his lifetime, nor the executors since his death, took the grant out of his possession. To all this may be added the question, why was the entry made in the name of a minor, if Robertson intended, when he made it, that the person whose name was used should transfer it ? He must have known such transfer could not be made till his arrival to the age of 21, which would not occur till five or six years afterwards. “Such entries in the names of others were at that time generally made in the names of those who could make an immediate assignment of the entry. It may be answered to these remarks, that the embarrassed circumstances of Elijah Robertson prevented an application to Maelin, for, in his hands, it was safe from the resort of creditors. If he delayed for the purpose of hiding this property from their researches, he ought not to be heard in this court to allege that as a reasoñ why the court should overlook his delay. It is an excuse which will not break any part of the force .attached to the objection of long forbearance. These unweakened circumstances produce in the mind a vibration, preclud *60 ing a satisfactory acquiescence in the proposition that the trust did or did not.exist, whereas, to remove the legal estate, there ought to be a conviction on the affirmative side.
As to the 1,666 acres of land conveyed by Hynes to Maclin on the 4th of July, 1795, James Robertson, as the executor of Mark Robertson, gave a power to Maclin to procure a deed in the name of Landon Carter. This seems to be a confirmation of that part of the answer which states that Elijah Robertson had purchased of Mark Robertson, and had agreed to * transfer to Landon Carter for a debt which Elijah Robertson owed him. On all hands it was understood, that by agreement it belonged to Elijah Robertson. But if intended for Landon Carter in 1795, he did not get the lands and did not of course give credit for them. He obtained judgment against the estate of Elijah Robertson in November, 1797, for $1,000, for 400 acres of land which he had loaned to Robertson in his life-time. What sum could have been fixed on as the price of the land after deducting from the price of $1,666, would leave the net sum of $1,000 ? It must have been in shillings and fractions or cents and parts of cents, which probably never was, either in 1797 or before, the current price of such lands. The second power which was from the representatives of Mark Robertson, Maclin says, was on the 27th of May, 1797, five months only before Carter’s judgment. The conveyance by Hynes was in 1801. Carter gave no credit. He received his satisfaction in money. There is not evidence enough to sustain Maclin’s statement to this part of the bill; he holds as a trustee for the complainants. As to the conveyance of 1,000 acres, made by Cocke to Maclin, the obligation on Cocke was not delivered to him. Maclin applied to him under the power of September, 1797. Cocke refused, he says, to convey for the benefit of Elijah Robertson’s representatives, but conveyed to him in discharge of a debt due to him by Cocke. Here is a denial of the charge in the bill, that it was made for the benefit of the complainants. There is no proof that the consideration for the conveyance moved from Elijah Robertson or his representatives. The charge is unsupported. As to the papers charged to have been deposited with Maclin, including Thomas Bond Blount’s agreement, and two grants issued on warrants No. 2,146, 2,556, to Redding Blount, he denies having recovered that on Cocke. He says nothing specifically of Blount’s and Thomas’s agree *61 ments, * nor of the grants. He says papers were deposited with him by Robertson in his life-time, and some by the executors since his death; that he has returned to them all such as were of any value, and the rest he has offered to deliver, and is yet ready to deliver. There is proof, that on the 20th of November, 1798, he. received from Sarah Robertson, the widow, the agreement •on Blount, in which Elijah Robertson is to locate, survey, &c., 12,800 acres of land, and is to have one half for his services, which agreement was accompanied with the two grants aforesaid. But is the proof admissible respecting the last mentioned papers ? No issue is joined upon the reception of them by Maclin. The defendant could not expect any proof on it on the side of the complainants ; he came, he supposed, prepared to meet it. This proof must be laid aside. The issue is upon the return of the papers in general. There is no proof of it; all that we can know is, that he received the papers and has not returned them, of what description, or of what value, is uncertain. These papers must belong to some of the complainants; those concerning the realty, to the heirs or devisees of Elijah Robertson, those concerning the personalty, to the executors. Can such papers be demanded of the heirs of Maclin, who alone are the defendants to this bill ? The executors of Maclin are to have the possession of all those for the non-return of which, to third persons, the owners of them, actions will lie against the executors. The heirs of Maclin are- only entitled to such papers, left by the testator, as concern the realty belonging to them. It may be, and no doubt is, correct to say, that simple contract debts may be recovered against the heirs of the debtor, being put in this country on the same footing as debts in England by specialty, wherein the heir is named by statute of George II. What shall otherwise be done with the real estate of a debtor by simple contract, who, leaving no personal estate, but land of * value sufficient to pay his debts, and without any executor or administrator ? The result of these considerations is, that no relief can be given against the personal defendants in respect of these papers. Decree that 1,666 acres of land mentioned in the bill of the complainants, which were conveyed by Joseph Hynes to William Maclin in discharge of the agreement of Nedely Hynes, through his brother with Mark Robertson, shall be divested out of the defendants, and shall be, and hereby are, vested in the complainants, *62 the widow and children of Elijah Robertson deceased, to be decreed amongst them in the proportions directed by the last will of the said Elijah Robertson, to hold to them, their heirs and assigns forever ; saving to John Childress, one of the complainants, such part or parts thereof as may have been conveyed to him by Washington L. Hannum, and his wife Patsey. That the bill be dismissed as to all the other matters complained of therein, and that the costs of the suit be paid by the defendants.
See, as to trusts, Barry v. Deloach, 2 Tenn. 395; Dudley v. Bosworth, 10 Hum. 9; Harris v. Carney, 10 Hum. 349; Smitheal v. Gray, 1 Hum. 491; Pritchard v. Wallace, 4 Sneed, 405; Sanders v. Harris, 1 Head, 185; McClellan v. McLean, 2 Head, 684; Harris v. Union Bank, 1 Cold. 152; King’s Digest, 419, 3011, 3039, 6596, 11,687.